**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:16-cv-23-FDW**

| | | |
|---|---|---|
| **CHRISTOPHER J. PARKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **HUBERT CORPENING, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

    **THIS MATTER** comes before the Court on Plaintiff's *pro se* Motion for Summary Judgment, (Doc. No. 74), in which he requests a hearing, Defendants' Motion for Summary Judgment, (Doc. No. 92), and Defendants' Motion to Stay Discovery, (Doc. No. 100).

## I.  BACKGROUND

    Pro se Plaintiff, a North Carolina prisoner currently incarcerated at the Tabor Correctional Institution,[1] filed this action on January 28, 2016 pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, and North Carolina negligence law. He named as Defendants Marion C.I. Superintendent Hubert Corpening and Staff Psychologist Valerie A. Carswell. The Complaint passed initial review on Plaintiff's deliberate indifference claims and on Plaintiff's state law negligence claims. (Doc. No. 39). Defendants were served, (Doc. No. 46), and filed an Answer, (Doc. No. 49). The Parties' cross Motions for Summary Judgment are now pending before the Court.

---

[1] Plaintiff was incarcerated at the Lanesboro Correctional Institution when he filed the Complaint.

**(1)** <u>**Complaint**</u> (Doc. No. 1)

Plaintiff alleges that he has a history of mental health issues dating back to 1998. A psychologist at Scotland C.I. re-diagnosed him with depressive disorder which caused him to be a threat to himself and others. (Doc. No. 1 at 5-6). That psychologist referred Plaintiff to a psychiatrist in Raleigh who prescribed medicine and said Plaintiff would be shipped to an institution where he would start treatment for his mental illness and receive medication. (Doc. No. 1 at 11). Plaintiff was told all his paperwork and files would be shipped along with him.

Plaintiff was transferred to Marion C.I. where Defendants denied him "any help or his medications" after Plaintiff repeatedly informed Defendants of his diagnosis and need for treatment. (Doc. No. 1 at 6). After Plaintiff informed Defendants of his condition, he was still housed around general population inmates who are not mentally ill. Plaintiff began experiencing frustration, confusion, and difficulty distinguishing reality from fiction. As a result, he cut himself with razorblades, set fires to burn his own skin, and ate feces and smeared it on his body and cell. (Doc. No. 1 at 6).

Plaintiff informed Defendants of his need for treatment on numerous occasions including a grievance dated October 6, 2014. On December 23, 2014, the third-step grievance response agreed that Petitioner was prescribed mental health medications. (Doc. No. 1 at 6). Plaintiff made this information available to Carswell and Corpening, who again denied him treatment and medication. By this time, Plaintiff had gone 16 months without his medication or any treatment for his mental illness.

On January 11, 2015, Plaintiff received a disciplinary incident report. Defendant Carswell wrote a statement saying that she reviewed Plaintiff and found no action where medications were prescribed despite Plaintiff having informed her of the grievance disposition to the contrary. (Doc.

No. 1 at 13). Carswell insisted that Plaintiff does not need the previously prescribed medications that he should be "accountable for all his actions [because] his mental health illness is no excuse." (Doc. No. 1 at 6). Plaintiff complains that Defendants' actions were deliberately indifferent and negligent.

Plaintiff seeks injunctive relief, declaratory judgment, and compensatory and punitive damages. (Doc. No. 1 at 4-5).

**(2)** **Plaintiff's Motion for Summary Judgment** (Doc. No. 74)

Plaintiff argues that the records attached to his Complaint show that he was prescribed mental health medication and that a genuine dispute of material fact exists.

He argues that his October 8, 2014, grievance proves that he was complaining about needing mental health medications and that the Step-One and Step-Two grievance responses stating that Plaintiff is not currently prescribed mental health medication, show that Defendant Carswell knew what was going on. The Step-Three response shows that Plaintiff is currently prescribed mental health medication and that staff adequately addressed Plaintiff's concerns, and therefore a real dispute exists about whether Plaintiff was prescribed mental health medications.

The Disciplinary Hearing Records show that Plaintiff wrote that he needed his mental health medication that was being denied by Defendant Carswell, and that Carswell stated that Plaintiff was not prescribed medication and that there is no mental health reason he should not be held accountable for his actions. Carswell further stated that Plaintiff does not need the previously prescribed medications. Carswell sounded confused in her statements.

Plaintiff wrote to the head nurse asking the name of the mental health doctor from Scotland prison who diagnosed him, and what the diagnosis was. The nurse responded that the diagnosis was depressive disorder, and the doctor's name was Robert E. Deakins. Plaintiff argues that the

diagnosis shows he must have been prescribed mental health medication and that a real dispute exists.

Plaintiff argues that Superintendent Corpening is liable under 1983 if he became aware of a violation of his rights through grievance appeals and disciplinary decisions and failed to take steps to remedy it. He also states that a supervisor can be found personally involved in a violation if he develops an unconstitutional policy or allows an unconstitutional policy to continue.

**(3)** **Defendants' Response** (Doc. No. 76)

Defendants argue that Plaintiff's Motion for Summary Judgment is vexatious, frivolous, and without merit. The first five paragraphs of the Motion are substantially identical to the allegations in the Complaint and refer to the exhibits attached to the Complaint. Plaintiff failed to prove any elements of his cause of action against Defendants and has not proffered any testimony or evidence in support of his motion other than the self-serving allegations in his Complaint and its exhibits. Defendants have denied all of Plaintiff's claims including claims for negligence and medical indifference.

**(4)** **Defendants' Motion for Summary Judgment** (Doc. No. 92)

Defendants argue that Plaintiff's deliberate indifference and negligence claims fail because they are refuted by the undisputed medical records, and that Defendant Corpening is not subject to supervisory liability. Defendants are entitled to qualified immunity on the claims against them in their individual capacities, the claims against them in their official capacities are barred by sovereign immunity, and no evidence exists of aggravated conduct sufficient to create an issue of fact as to punitive damages.

Plaintiff's deliberate indifference and negligence claims fail because Plaintiff is not entitled to unqualified access to mental health care and treatment of his choice. His disagreement over the

care provided does not demonstrate deliberate indifference. Plaintiff was not deprived of mental health care and there is no evidence to support a showing of serious harm related to his mental health. Undisputed medical evidence shows that Plaintiff received continuous and appropriate mental health treatment. There is no evidence that Defendants' actions were grossly incompetent, inadequate, or excessive, or that they knew and disregarded an excessive risk to his health.

Plaintiff's supervisory liability claims fail because Defendant Corpening did not supervise or have control over the medical staff, and NCDPS Policy and Procedures provide that clinical matters are solely in the province of license health care providers, not correctional staff like the Acting Superintendent.

Defendants are entitled to qualified immunity for claims against them in their individual capacities because they did not transgress any "bright line" area of law. (Doc. No. 93 at 17). They acted reasonably and appropriately with regards to Plaintiff's subjective mental health needs.

Defendants are entitled to summary judgment on their official capacity claims because the suit against them is barred by Eleventh Amendment immunity.

Defendants are entitled to summary judgment for Plaintiff's punitive damages claims because no evidence exists of aggravated conduct sufficient to create an issue of fact as to punitive damages.

**(5)**    **Plaintiff's Response** (Doc. No. 98)

Plaintiff cites case law setting forth the deliberate indifference standard that applies to serious medical needs. He also cites case law regarding the qualified immunity standard. He further states:

> If any negative entries have been put in your prison records because of your suit or the actions you are suing about, you may be able to avoid mootness by asking the court to order the prison officials to remove (or 'expunge') these entries from your

5

records. The federal courts have held that a case is not moot if it could still cause[] you some related injury.

(Doc. No. 98 at 4).

Plaintiff asks the Court to order Defendants to "expunge entries that speaks negative, when it has nothing to do with the case itself." (Doc. No. 98 at 2).

**(6)** **Defendants' Reply** (Doc. No. 99)

Defendants argue that the Responses to Plaintiff's October 8, 2014, grievance show that Plaintiff was never prescribed mental health medications at the relevant time period at Marion C.I. The Step-Three grievance response contains a typographical error that excludes the word "not" from the sentence "currently prescribed mental health medications." (Doc. No. 99 at 2). The responses to Plaintiff's January 28, 2015, grievance also show that Plaintiff was not prescribed any mental health medications and that his concerns regarding mental health treatment and medications had been adequately addressed. Plaintiff was not denied any mental health medications at Marion C.I. because he was not prescribed to receive such medications at that time and therefore he was not "denied" mental health medications. (Doc. No. 99 at 4). The record establishes that Plaintiff's constitutional rights were not violated by Defendants and Defendants were not negligent. There is no evidence to support any deliberate indifference or negligence with respect to Plaintiff's serious mental health needs, and there is no evidence that Defendant Corpening had any involvement in Plaintiff's mental health treatment. The medical evidence shows that Plaintiff received reasonable, timely, and appropriate mental health treatment in accordance with NCDPS policies and procedures.

Plaintiff's supervisory liability claims fail, Defendants are entitled to qualified and sovereign immunity, and there is no foundation for punitive damages. Therefore, summary

judgment should be granted in Defendants' favor as to all claims.

**(7)** **Evidence**[2]

    **(A)** **Plaintiff's Affidavit** (Doc. No. 96)

Plaintiff states that he has had mental health problems since childhood. Defendant Carswell kept telling him that he does not need mental health medications even though his depressive order that was diagnosed by Dr. Deakins at Scotland C.I. and was worsening. Dr. Deakins told Plaintiff that, once he got to another prison, his files would follow him and that his medications would arrive shortly thereafter. Plaintiff alleges that he was shipped to Marion C.I. in the first place because he did not get along with an officer. Dr. Deakins told Plaintiff that he would be shipped to a mental health prison once the files and medications arrived. After Plaintiff saw that Defendants Carswell and Corpening would not help him by sending him to a mental health prison, he filed a grievance. Plaintiff argues that there is no way he was diagnosed with depressive disorder and not prescribed any mental health medications. Plaintiff filed a second grievance and received a Step-Three response confirming that he was currently prescribed mental health medications. Plaintiff alleges that he went through embarrassment from hurting himself. After Defendant Carswell was taken off his case, he was assigned to another psychologist who re-diagnosed him and prescribed the same medication as Dr. Deakins. This means that Plaintiff was denied his prescribed mental health medications. Plaintiff agrees that Defendant Corpening is not a psychologist but that, as Acting Superintendent, he had the power to keep Plaintiff safe from himself and other inmates. Plaintiff informed Defendant Corpening many times in writing about what was going on with Plaintiff and he failed to keep Plaintiff safe by shipping him to another prison.

    **(B)** **Affidavit of Hubert Corpening** (Doc. No. 94-2)

---

[2] This section is not exhaustive.

Defendant Corpening was the Assistant Superintendent acting as Superintendent at Marion C.I. As such, he was responsible for overseeing all staff and inmates in his supervisory chain of command to ensure compliance with NCDPS policies and procedures.

During all relevant times, correctional staff like Corpening would not be responsible for personally providing clinical or mental health care to inmates at Marion C.I. including medications and mental health treatment. Corpening has no formal medical training and is not licensed to prescribe medications. He is not a health care provider and was not, at any time, responsible for personally providing clinical or mental health care to inmates at Marion C.I. Nor is he responsible for the clinical supervision of any clinical or mental health care providers at the facility.

NCDPS policy and procedures provide that clinical matters involving mental health judgments are the sole province of licensed clinical and mental health care providers. The Facility Head's responsibility is to provide an environment that ensures the appropriate delivery of medical and mental health services. The Facility Head designates in writing a specific individual with the responsibility for overseeing/ managing the provision of health services to the facility. The designee is responsible for making sure that procedures, such as sick call appointment requests, exist so that the inmate population has access to health care. NCDPS policy and procedures provide that all inmates can access routine health care through the sick call process. All inmates also have the ability to declare a medical emergency and the inmate will be assessed by medical immediately.

Correctional staff such as Defendant Corpening would not have any training on the appropriate medical or mental health treatment for inmates. Nor would he have the ability to control or alter a plan of care concerning any inmate's mental health care.

Plaintiff also had access to the grievance process through which he could complain about his medical or mental health treatment. Any of Plaintiff's complaints would be investigated

through the grievance process.

Correctional staff such as Defendant Corpening are only allowed limited information regarding an inmate's health records pursuant to HIPAA.

Based on information and belief, at no time during Plaintiff's mental health treatment at Marion C.I. did he warrant involuntary or emergency mental health treatment, nor did he present with issues warranting a referral to residential or inpatient mental health treatment, which would have housed him in an area with other inmates needing or receiving mental health treatment. Based on information and belief, inmates receiving outpatient mental health treatment such as Plaintiff are generally housed in the "general population" with other inmates who could potentially not have mental health issues. (Doc. No. 94-2 at 5).

As Acting Administrator, Defendant Corpening is unaware of any medical staff intentionally preventing Plaintiff from receiving his mental health treatment or being deliberately indifferent to Plaintiff's mental health needs. He is also unaware of any healthcare provider who intentionally delayed providing mental health treatment to Plaintiff. At all relevant times, medical staff acted within the course and scope of their employment and training with NCDPS.

    **(C)**    **<u>Affidavit of Valerie Carswell</u>** (Doc. No. 94-3)

Defendant Carswell was the Staff Psychologist at Marion C.I. at the relevant time. As such, she was responsible for providing mental health treatment for inmates within the NCDPS policies and procedures.

Defendant Carswell initially met Plaintiff after he was transferred to Marion C.I. with a previously scheduled follow-up appointment with a psychologist. During her first contact with Plaintiff on November 7, 2013, he was uncooperative, irritable and argumentative. Plaintiff became angry with her for asking clinically relevant questions even when she attempted to explain

that this is one of the ways that psychologists try to help patients. The session was ended as Plaintiff was uncooperative and disagreeable. The next session on November 19, 2013, was a follow-up to the first contact. Plaintiff continued to be uncooperative, irritated, and easily defensive when Defendant Carswell asked questions. During both mental health sessions, a referral to a psychiatrist was not warranted. However, Carswell did offer continued therapy with herself as the Staff Psychologist. She also documented that she would continually reassess his treatment needs and refer him to a psychiatrist in future if needed.

During the November 19, 2013, mental health session, Carswell completed a mental health assessment and treatment plan. Plaintiff reported mood swings, depression, and anger issues and continued to be uncooperative. While he self-reported depression, Carswell did not have enough clinical information to diagnose Plaintiff with a depressive disorder. Plaintiff agreed to work with Carswell in individual therapy on anger management. He was scheduled for follow-up sessions.

During the next mental health session on December 4, 2013, Plaintiff appeared to be in good spirits and was cooperative. However, he continued to ask to be referred to a psychiatrist. His subjective presentation and self-reports of distressed continued to not rise to the level of warranting a referral to a psychiatrist. Plaintiff reported that he only read a little bit of the handouts Carswell had previously given him. They discussed that, even if he were referred to a psychiatrist, he would still be expected to follow up with psychology.

During the next session on December 18, 2013, Plaintiff was seen by Carswell at the request of correctional staff because he was upset. While attempting to help Plaintiff deal with his issues, Plaintiff made vague threats to act out and throw feces if his issues were not addressed. When Plaintiff was told that he was responsible for his actions, he stated he was finished and left the office.

The next day, December 19, Plaintiff continued to be frustrated over the issues from the previous day but appeared more calm and was agreeable to working on his anger management. However, he refused to attend two scheduled sessions on January 9 and 23, 2014. As a direct result of his refusal to attend, he was removed from the mental health caseload. Future contacts with Plaintiff were in response to requests from Plaintiff and/or referrals from correctional staff.

Carswell's next contact with Plaintiff was on September 2, 2014. He was uncooperative and demanded his mental health medications. He stated that, if he went back to general population, he would harm others. Carswell asked that Plaintiff allow her time to do a chart review and he agreed.

The next contact was on October 8, 2014. Plaintiff continued to be uncooperative, irritable and demanding. He continued to demand mental health medications to control his behavior. However, Carswell told him that a referral to a psychiatrist was not warranted at that time and continued to offer individual therapy. Plaintiff argued that he did not have anger management issues and that he needed mental health medications for a diagnosis he received at a previous institution. Plaintiff could not remember the diagnosis. Carswell explained that there are a variety of ways to treat mental health diagnoses, not just medication. He was unwilling to hear her out, continued to demand medications, and yelled for a correctional officer to take him back to his cell. Carswell did not reschedule Plaintiff to be seen at that time.

On October 21, 2014, Carswell approached Plaintiff's cell door for a segregation check. He was lying in bed and did not get up when she approached the door. He was uncooperative and self-reported that he was homicidal.

On December 16, 2014, Carswell attempted to see Plaintiff in response to a referral she received from him. However, when she attempted to see him, he refused to attend the session.

On January 2, 2015, she approached Plaintiff's cell door for a segregation check. He was lying in bed and told her to "get away from [his] door." (Doc. No. 94-3 at 6).

On January 11, 2015, Carswell received a referral from correctional staff that Plaintiff had been placed on self-injury precautions ("SIP") after he smeared feces on his cell windows and walls. Plaintiff also told custody staff that he eats feces and likes it.

Carswell never denied Plaintiff mental health care as Staff Psychologist at Marion C.I. Despite his requests, based on her own observations and evaluations of Plaintiff, she did not feel like his mental health status warranted referral to a psychiatrist or mental health medications at that time.

Any alleged delay in the treatment of Plaintiff's mental health complaints was due to his unwillingness to work with Carswell to gather additional clinically relevant information about his self-reported issues, as well as his unwillingness to try therapy and treatment modalities other than medications.

At no time did Carswell refuse or deny Plaintiff mental health treatment. She consistently offered him individual therapy and she continually reassessed his treatment needs including assessing the need for referral to a psychiatrist if warranted.

Plaintiff's refusal to attend therapy sessions, refusal to work on issues during their contacts, and his continued presentation as irritable, belligerent, and uncooperative made providing appropriate treatment difficult and challenging, and were also interpreted as non-verbal signs that Plaintiff was uninterested in treatment and was refusing the mental health treatment that was being offered to him at Marion C.I.

At no time during her treatment of Plaintiff did he warrant involuntary or emergency mental health treatment. At no point during their contacts did Plaintiff present with issues

warranting a referral to a residential or inpatient mental health treatment, which would have housed him in a housing area with other inmates needing or receiving mental health treatment. Inmates receiving outpatient mental health treatment such as Plaintiff are generally housed in "general population" with other inmates that could potentially not have mental health issued. (Doc. No. 94-3 at 8). At no point during their contacts did Plaintiff present as psychotic or delusional. During all of their mental health sessions, Plaintiff was oriented, coherent, though processes were intact, and hallucinations/delusions were not present.

As Staff Psychologist at Marion C.I., Carswell is unaware of any medical staff intentionally preventing Plaintiff from receiving his mental health treatment or being deliberately indifferent to his mental health needs. She is also unaware of any healthcare provider who intentionally delayed providing mental health treatment to Plaintiff. At all relevant times, medical staff acted within the course and scope of their employment and training with NCDPS

**(D)** **NCDPS Policy & Procedures** (Doc. No. 94-2 at 6)

The NCDPS Health Care Policy states that it is the responsibility of each Facility Head "to designate, in writing, a specific individual with the responsibility of overseeing/managing the provision of health services to their facility." (Doc. No. 94-2 at 6). Each correctional facility has a designated health authority with responsibility for "arranging for all levels of health care and ensuring quality health services for inmates." (Id.). Clinical matters involving "medical, nursing, mental health and dental judgments are the sole province of licensed health care providers." (Doc. No. 94-2 at 7).

**(E)** **Health Services Policy & Procedure Manual** (Doc. No. 94-2 at 10)

The Health Services Policy and Procedure Manual ("Manual") addresses in the section

entitled "Administrative – Organization: states that it is the Facility Head's responsibility to "designate, in writing, a specific individual with the responsibility for overseeing/ managing the provision of health services to their facility." (Doc. No. 94-2 at 10). It is the designated health authority's responsibility to "ensure that the physical well-being of the population is attended to, which includes the inmates' medical, dental, nursing, personal hygiene, dietary, health education, and environmental needs." (Id.). Clinical care matters involving "medical, nursing, mental health and dental judgments are the sole province of licensed health care providers." (Doc. No. 94-2 at 11).

The Manual's section addressing Care and Treatment of Offender provides that "[h]ealthcare will be accessible to all offenders through the sick call process, offender declared emergencies and/or telephone triage on a 24-hour, 7-day basis." (Doc. No. 94-2 at 13). Non-urgent, non-emergency medical requests that do not indicate a need for evaluation by a provider and can be effectively addressed by nursing staff will be managed by appointment unless an emergency situation exists. (Doc. No. 94-2 at 13-14). If an offender declares an emergency, the nurse on duty will evaluate and, if its deemed to be an emergency, the offender will be assessed and documentation will be noted in the health care record. (Doc. No. 94-2 at 14). If it is not deemed an emergency, the offender will be told to submit a sick call request. (Id.).

**(F)** **Medical Records**

11/7/13        Mental Health Services Referral (by Carswell) (Doc. No. 94-3 at 34)
               Oriented, calm, coherent, uncooperative, irritable/argumentative, thought processes are intact, no hallucinations/delusions.
               Plaintiff reports seeing MH at his previous camp for depression, reported that "the psychologist at his previous camp was **referring him to the psychiatrist for possible meds**"
               Plaintiff reports he was on medications as a child, ending at age 15
               Session was ended when psychologist's questions made Plaintiff "increasingly angry, agitated and defensive"

"While inmate may have an Axis I diagnosis, today's behavior appears to be due to inmate being immature, impulsive, characterological, and with poor anger management skills. It is noted that, during the session, inmate appeared focused on a referral to a psychiatrist. **A referral to the psychiatrist is not warranted at this time**; however, inmate will continue to be assessed and will be referred in the future if needed."

11/19/13    <u>Mental Health Services Referral</u> (by Brigitte Buchanan)(Doc. No. 94-3 at 33)
Staff referral: Plaintiff says he is supposed to be on Mental Health meds, says we won't help him. Angry.

11/19/13    <u>Mental Health Assessment Update</u> (by Carswell)(Doc. No. 94-3 at 31)
Plaintiff reports a history of being on Thorazine and Depakote, and reports last being on medication in 2009
Per prior Report, smearing feces is manipulation/feigning a mental health disorder
Uncooperative, thought processes are intact, no hallucinations/delusions, oriented, memory is intact, no current impairment in self-perception.
Inmate reports depression and mood swings, states "**he needs his medicine**"
Plaintiff does not show symptoms of depression
"**A current referral to the psychiatrist is not warranted**"
He will continually be reassessed and will be referred to the psychiatrist if needed
Plaintiff agreed to work on anger management but his motivation is questionable
Plaintiff added to the MH caseload, will be sent anger management pamphlets

12/4/13    <u>Mental Health Progress Note</u> (by Carswell)(Doc. No. 94-3 at 36)
Cooperative, no hallucinations/delusions, no impairment in self-perception, oriented, memory is intact, no SI/HI or destructive ideation
Distress judged to be a 3 or 4 on a 10 point scale; able to smile/laugh appropriately
He read a "little bit" of the handouts the clinician sent him
"**He again asks to be put on meds. Review with inmate that, at this time, a referral to the psychiatrist is not warranted.**"

12/18/13    <u>Mental Health Progress Note</u> (by Carswell) (Doc. No. 94-3 at 36)
Plaintiff is upset about a missing package from family, made "vague threats about throwing feces." When he is reminded he is responsible for consequences, he **gets up to leave**.
No signs/symptoms of a psychotic, affective or delusional disorder.
Plaintiff shows "characterological disorder and poor coping skills."

12/19/13    <u>Mental Health Progress Note</u> (by Carswell) (Doc. No. 94-3 at 37)
Cooperative, frustrated, no hallucinations/delusions, oriented, no SI/HI or destructive ideation.
Still frustrated about his missing package but calmer and more cooperative

1/9/14    <u>Mental Health Progress Note</u> (by Carswell)(Doc. No. 94-3 at 38)

Refusal; follow up in 30 days

1/23/14     Mental Health Progress Note (by Carswell) (Doc. No. 94-3 at 39)
            Refusal; removed from MH caseload

1/23/14     Memorandum to Plaintiff (by Carswell) (Doc. No. 94-3 at 40)
            "If you should change your mind and wish to continue mental health treatment,
            please fill out the enclosed mental health referral form and either give to staff or
            place in a sick call box or institution mail box."

9/22/14     Mental Health Services Referral (by Carswell) (Doc. No. 94-3 at 41)
            Staff Referral by Sgt. Guzman
            Oriented,    coherent,    uncooperative,    mood    is    agitated/demanding    no
            hallucinations/delusions, denies current SI.
            Plaintiff demands "**I need my meds,**" says he cannot control himself and will harm
            others in gen pop
            In the session, **he continually demands his MH meds** to help keep him out of
            trouble, says he cannot control himself or keep himself out of trouble.
            **Psychologist agrees to review Plaintiff's chart**.

9/22/14     Inmate Letter (Doc. No. 94-3 at 42) (by Plaintiff)
            To Sgt William: "**I suppose to be on mental health medication due to me being
            re-diagnoses by the mental health doctor**. These people ain't trying to help me.
            **I need my medication and if I don't get put medication I give you my word
            whatever block I go to I am going to stabbed or cut the first person that cross
            my path**. A helicopter will land on this yard get me to an camp were I can receive
            my medication. **A mental health doctor rediagnoses me a Scotland prison** and
            he told me when I ship that the paperwork will follow me so I would be put on my
            medication but nothing has happened yet. I give you my word if I don't have my
            medication by the time I come off its going down you can look in my medical
            docket and see that I'm telling the truth."

9/22/14     Email  (by Braden Guzman) (Doc. No. 94-3 at 43)
            To staff including Corpening and Carswell: Plaintiff cursed and threatened officers
            on 9/22, said that he would "set this whole block off!;" threatened to start throwing
            urine and feces to make it a miserable place to work; wrote letter saying he will
            turn wherever he goes into a blood bath. Disciplinary has been initiated.

9/23/14     Referral (by Carswell) (Doc. No. 94-3 at 45)
            Oriented, calm, coherent, uncooperative, irritable/demanding, no hallucinations or
            delusions, no current SI/HI or destructive ideation.
            "**Inmate continues to demand/insist that he needs meds**" for acting out, anger.
            Referral is not warranted at this time, offered individual therapy for anger
            Plaintiff becomes belligerent and states that it is not about anger. He indicates that
            **he was diagnosed by a doctor at Scotland CI and he needs meds for this**

16

**diagnosis; however, he does not remember what the diagnosis was.**
Plaintiff unwilling to consider treatment other than medication
Plaintiff yells for an officer and storms out
Plaintiff will not be rescheduled, can submit form for treament

10/8/14       <u>Memorandum</u> (by Carswell) (Doc. No. 94-3 at 44)
To Plaintiff: Uncooperative behavior indicates he no longer wants mental health treatment. "If you should change your mind and wish to continue mental health treatment, please fill out the enclosed mental health referral form … and place it in a sick call box, place in an institution mail box, or hand to staff."

10/21/14     <u>Mental Health Segregation Assessment</u> (by Carswell) (Doc. No. 94-3 at 46)
Uncooperative, angry/hostile, oriented, coherent
Plaintiff denies SI but reports he wants to hurt others and states he's homicidal

12/16/14     <u>Mental Health Services Referral</u> (by Carswell) (Doc. No. 94-3 at 48)
Plaintiff self-refers: wants to talk to someone about depression and medication because the lady he saw is not helpful
Refusal to attend session

1/2/15        <u>Mental Health Segregation Assessment</u> (by Carswell)(Doc. No. 94-3 at 49)
Plaintiff states "get away from my door."

1/11/15       <u>Inmate Request for Assistance</u> (by Plaintiff) (Doc. No. 94-3 at 50)
"I'm about to sue Marion for denying me my mental health medication going on a year and 4 months. Raleigh reviewed me complaining not receiving my medications and wrote back on my behalf saying inmate Parker is currently prescribed mental health medications. But the Mental Health lady Ms. Carswell says it don't show on the record, which I already know she is telling a lie, because it's funny that I've had two nurse ladys telling me they look through my mental health jacket and they don't see why y'all still got me her on that I was diagnoses by a license doctor when I was at Scotland Prison this Sunday that just pass I smear my own feces all over my cell when putting it in my mouth. This is what I do when I get real angry to keep from hurting someone else. I cut myself a month ago. I'm suffering all because your staff does not want to do her job. If I was to go back on this yard and something was to happen to me you and a lot of other people are going to be in a world of trouble which you already is because you put your signature down agreeing with Marion Response about me not being on any mental health medications."

1/11, 1/12/15   <u>Mental Health Services Referral</u> (by Carswell) (Doc. No. 94-3 at 52)
Staff Referral by Marcella Faircloth
Plaintiff is irate, smeared feces on his cell windows and walls, says he eats feces and likes it; placed on SIB.
Oriented, calm, coherent, uncooperative, thought process intact, no

hallucinations/delusions, no current SI/HI.

Plaintiff states that Raleigh's response indicates he should be on MH meds; he smeared feces because he was mad.

**Psychologist did another chart/OPUS review** per Plaintiff's claim he should be on meds:

"The only reference to MH meds that the undersigned clinician can find is a discharge summary from CPMH in 2010. However, the undersigned clinician can find no other documentation (doctor's orders, psychiatric evaluations, psychiatric notes, etc.) since then indicating inmate has been prescribed meds. Also, there have been no OPUS entries indicating that inmate has seen a psychiatrist other than a treatment team entry on OPUS for 04/19/10."

**(G)** **Grievances** (Doc. No. 94-1)

10/8/14    Administrative Remedy Procedure (E3730-14-2290)(Doc. No. 94-1 at 3)
I been seeing the mental health lady Ms. Carswell, off and on, letting her know that I suppose to be on medication. Ms. Carswell is in denial of me requesting my medication after, I have already been rediagnose[d] at Scotland Prison by a license[d] doctor. I was also told by the doctor that diagnose[d] me, that my paperwork would follow me on to the next prison, and then I would be removed to a medical prison to start my mental health treatment. Everything that I'm telling you is in black and white in my mental health file. I also have a long mental history. I'm asking for some help 'cause I know what's best for me. My Eighth Amendment right has been violated….

10/10/14    Statement by Witness (Valerie Carswell) (Doc. No. 94-1 at 5)
"Currently, inmate Christopher Parker … is not prescribed mental health medications."

10/25/14    Step-One Response (Neil Barnette) (Doc. No. 94-1 at 4) (emphasis added)
"**You are not currently prescribed mental health medication**." No further action recommended.

11/14/14    Step-Two Response (Chris Crawford) (Doc. No. 94-1 at 4)
Your grievance has been properly responded to…. No further action recommended.

11/24/14    Step-Three Response (Inmate Grievance Examiner) (Doc. No. 94-1 at 1) (emphasis added)
Inmate Christopher Parker filed this grievance at Marion Correctional Center on October 8, 2014 complaining he has not received his medications. **Staff responded that inmate parker is "currently prescribed mental health medications."**
I am convinced that staff has adequately addressed this inmate's grievance concerns. "**I adopt the facts found by the staff investigator.**"
Grievance is considered resolved by DPS staff.

18

1/28/15        <u>Administrative Remedy Procedure</u> (E3730-15-2037)(Doc. No. 94-1 at 8)
Ms. Carswell is still denying me to see the mental health doctor after Raleigh wrote me back saying that inmate Parker is currently prescribed mental health medications. I even have a copy of a request form w[h]ere the nurse at Marion wrote telling me my mental illness that I have been diagnose[d] with. It's called depressive disorder. That is a real serious mental illness that can lead to me killing myself. Ms. Carswell is still acting like she don't know what's going on. She also was aware of me smearing and eating my own feces, and she [is] still not trying to help me after I have been prescribed by a doctor. Asst superintendent was also aware of my mental health illness but still den[i]ed me the help when writing him letting him know I [am] suppose[d] to be on mental health medications. I fear of being around the police and inmates without my medications. Stop denying me my prescribed mental health medications and send me to a prison that can treatment for my illness 'cause I fear being here at Marion being treated like an animal.

2/4/15        <u>Statement by Witness</u> (Valerie Carswell) (Doc. No. 94-1 at 10)
Per review of medical chart and OPUS records show, "**he currently is not prescribed mental health medications**."
Mental health treatment is available at his request.
Mental health staff constantly assesses and evaluates for appropriate and proper treatment for each individual.

2/15/15        <u>Step-One Response</u> (Thomas Hamilton)(Doc. No. 94-1 at 9)
Carswell reports that per your medical chart and OPUS records "**you are currently no[t] prescribed mental health medication**."
Mental health treatment is available by request. Mental health staff constantly assessed and evaluates for appropriate and proper treatment for each individual. Plaintiff is encouraged to seek mental health if needed by completing a mental health referral. No further action is recommended.

3/7/15        <u>Step-Two Response</u> (Chris Crawford) (Doc. No. 94-1 at 9)
"Your grievance has been properly responded to." No further action recommended.

4/7/15        <u>Step-Three Response</u> (Inmate Grievance Examiner) (Doc. No. 94-1 at 6)
"I am convinced that staff has adequately addressed this inmate's grievance concerns. I adopt the facts found by the staff investigator."
No further action is warranted, grievance is dismissed.

## II.    LEGAL STANDARDS

### (1)    **Summary Judgment**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P.

56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  <u>Id.</u> at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  <u>Id.</u> at 324.  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Sylvia Dev. Corp. v. Calvert County, Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  <u>Anderson</u>, 477 U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (quoting <u>Matsushita v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

**(2)     <u>Deliberate Indifference</u>**

"Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in <u>Farmer v. Brennan,</u>

[511 U.S. 825, 832 (1994)].” <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016). First, "Farmer's objective prong requires plaintiffs to demonstrate that 'the deprivation alleged [was], objectively, sufficiently serious.'" <u>Scinto</u>, 841 F.3d at 225. In order to be sufficiently serious, the deprivation must pose "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from ... exposure to the challenged conditions." <u>De'lonta v. Angelone</u>, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted).

As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 103-04 (1976). To state a case of deliberate indifference to a serious medical need, a plaintiff must show that he had serious medical needs and that the defendant acted with deliberate indifference to those needs. <u>Heyer v. United States Bureau of Prisons</u>, 849 F.3d 202, 210 (4th Cir. 2017) (citing <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Iko</u>, 535 F.3d at 241 (internal quotation marks omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* <u>Farmer</u>, 511 U.S. at 825. However, mere negligence or malpractice does not violate the Eighth Amendment. <u>Miltier</u>, 896 F.2d at 852. "[M]ere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." <u>Scinto</u>, 841 F.3d at 225 (quoting <u>Wright v. Collins</u>, 766 F.2d 841, 840 (4th Cir. 1985)).

**(3)**     <u>**Sovereign Immunity**</u>

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. <u>Bright v. McClure</u>, 865 F.2d 623, 626 (4th Cir. 1989) (citing <u>McConnell v. Adams</u>, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. <u>See</u> <u>Almone v. City of Long Beach</u>, 478 F.3d 100, 106 (2d Cir. 2007); <u>see</u> <u>Hutto v. S.C. Retirement Sys.</u>, 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(4)**     <u>**Qualified Immunity**</u>

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based

on mixed questions of law and fact." Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (quoting Butz v. Economou, 438 U.S. 478, 507 (1978), for the proposition that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law"). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 784 (4th Cir. 1993) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted). Where the defendant's entitled to immunity turns on a factual dispute, that dispute is resolved by a jury at trial. Id. (citing Turner v. Dammon, 848 F.2d 440 (4th Cir. 1988), *overruled on other grounds by* Johnson v. Jones, 515 U.S. 304 (1995)).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials

23

accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson</u>, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." <u>Amaechi v. West</u>, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." <u>Id.</u> at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

<u>Anderson</u>, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. <u>Owens ex rel. Owens v. Lott</u>, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." <u>Booker v. South Carolina Dep't of Corr.</u>, 855 F.3d 533, 543 (4th Cir. 2017); <u>Owens</u>, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. <u>White v. Pauly</u>, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule

… may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

**(5)     Supplemental Jurisdiction**

The district courts have supplemental jurisdiction over claims that are so related to the claims over which the court has original jurisdiction that they "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A court may decline to exercise supplemental jurisdiction if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c)(1)-(4). When district courts dismiss all claims independently qualifying for the exercise of federal jurisdiction, they ordinarily dismiss as well all related state claims. Artis v. D.C., 138 S. Ct. 594, 597–98 (2018); 28 U.S.C. § 1367(c)(3). Following dismissal under § 1367(a), a plaintiff has 30 days within which to refile supplemental claims in state court unless state law provides for a longer tolling period. 28 U.S.C. § 1367(d); Artis, 138 S.Ct. at 594.

**III.     DISCUSSION**

**(1)     Deliberate Indifference**

Plaintiff argues in his Motion for Summary Judgment that the records attached to his Complaint show that he was prescribed mental health medication and that a genuine dispute of material fact exists. His argument rests on his numerous requests for mental health medications and the Step-3 Response to his October 8, 2014, grievance that ostensibly shows that he is currently

prescribed mental health medication. He claims that Defendant Carswell repeatedly denied him the medication that Dr. Deakins at Scotland C.I. had prescribed for him, and that Defendant Corpening became aware of a violation of his rights through grievance appeals and disciplinary decisions but failed to act and because he allowed an unconstitutional policy to continue. Defendants argue that Plaintiff's deliberate indifference and negligence claims fail because they are refuted by the undisputed medical records, and the Defendant Corpening is not subject to supervisory liability.

Plaintiff has failed to carry his burden on summary judgment whereas Defendants have demonstrated that no genuine dispute of material fact exists and that they are entitled to judgment as a matter of law.

Plaintiff claims that Defendants Carswell and Corpening were deliberately indifferent to a serious medical need by failing to provide previously-prescribed mental health medication. However, the medical records submitted by Defendants reveal that Defendant Carswell reviewed Plaintiff's records on at least two occasions[3] and found no prescription for mental health medication. (Doc. No. 94-3 at 34). Rather, Plaintiff self-reported depression and told Carswell that the psychologist at his previous camp "was referring him to the psychiatrist for ***possible*** meds." (Doc. No. 94-3 at 34) (emphasis added). Carswell saw Plaintiff on multiple occasions, assessed him each time, and offered him treatment that she considered appropriate under the circumstances including anger management and individual therapy. Carswell saw Plaintiff for scheduled appointments and provided him with written materials to work on anger management. Plaintiff

---

[3] The record indicates that these reviews occurred on September 22, 2014, and January 11, 2015. Moreover, Plaintiff has failed to file any evidence showing that he was prescribed mental health medications. See (Doc. No. 97-1) (untimely discovery request seeking, *inter alia*, medical records signed by Plaintiff on November 20, 2018 and docketed on November 28, 2018).

was uncooperative during several of the appointments and he was eventually removed from the mental health caseload after his refusals to attend. Carswell nevertheless saw Plaintiff each time he was referred for treatment, either by himself or staff, and repeatedly offered to help him with his mental health issues. She continually monitored and reassessed Plaintiff during each contact and did not find mental health medications or a referral to a psychiatrist to be warranted at any time. Plaintiff's desire for medication and disagreement with Defendants Carswell's course of treatment fail to establish deliberate indifference. See Jackson v. Lightsey, 775 F.3d 170, 178 (4ᵗʰ Cir. 2014) (a "[d]isagreement[ ] between an inmate and a physician over the inmate's proper medical care," fall short of showing deliberate indifference) (quoting Wright v. Collins, 766 F.2d 841, 849 (4ᵗʰ Cir. 1985); citing United States v. Clawson, 650 F.3d 530, 538 (4ᵗʰ Cir. 2011)).

Plaintiff's reliance on the Step-Three Response to his grievance is misplaced. The record reveals that the Step-One Response recommended no further action because "You are **not** currently prescribed mental health medication." (Doc. No. 94-1 at 4) (emphasis added). The Step-Two Response found that the grievance had been properly responded to and that no further action was recommended. (Doc. No. 94-1 at 4). The Step-Three Response expressly "adopt[ed] the facts found by the staff investigator" but misquoted those findings by omitting the word "not" from the sentence "currently prescribed mental health medications." (Doc. No. 94-1 at 1). This obvious typographical error is not sufficient to create a genuine dispute of material fact to avoid summary judgment. See generally Smith v. Ozmint, 578 F.3d 246, 254 (4ᵗʰ Cir. 2009) ("Although the undersigned does not make a credibility determination, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'").

Because Defendant Carswell is entitled to summary judgment on the deliberate indifference claim, Defendant Corpening is also entitled to summary judgment. He avers, and Plaintiff fails to rebut, his lack of medical training or ability to prescribe medication. Because there was no underlying deliberate indifference by Defendant Carswell, there can be no supervisory liability by Defendant Corpening. See Waybright v. Frederick County, Md., 528 F.3d 199 (4th Cir. 2008) (noting that "supervisors and municipalities cannot be liable under § 193 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages.") (quoting City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)). Moreover, nothing about Plaintiff's grievances, letters, or disciplinary proceedings reveals any serious risk of harm to Plaintiff from any actions, inactions, or policies that Defendant Corpening ignored or failed to correct.

Because no genuine dispute of material fact exists with regards to Defendants' deliberate indifference, Plaintiff's claim for punitive damages with regards to their alleged deliberate indifference necessarily fails. See generally Smith v. Wade, 461 U.S. 30, 51 (1983) (punitive damages are appropriate where the defendant has demonstrated "reckless or callous disregard for the plaintiff's rights" or committed "intentional violations of federal law.").

Therefore, Plaintiff's Motion for Summary Judgment will be denied. Defendants' Motion for Summary Judgment will be granted on Plaintiff's deliberate indifference and punitive damages claims.

**(2)      Sovereign Immunity**

Defendants argue that sovereign immunity bars Plaintiff from recovering damages from Defendants in their official capacities. Defendants argue that Plaintiff's claims for monetary damages against Defendants in their official capacities are essentially claims against the State of

North Carolina and are thus barred by sovereign immunity.

The Court agrees with Defendants that the damages claims against them in their official capacities are barred by sovereign immunity. See generally Will, 491 U.S. at 66. Therefore, Defendants' Motion for Summary Judgment will be granted on Plaintiff's claims for damages against them in their official capacities.

**(3)** **Qualified Immunity**

Defendants argue that they are entitled to qualified immunity on Plaintiff's individual capacity claims for damages. Defendants argue that they were following NCDPS policies and procedures, they neutrally and rationally in carried out those policies and procedures, and that their individual conduct was objectively reasonable in light of constitutional requirements. They argue that Plaintiff has failed to overcome Defendants' showing that their actions were reasonable under the circumstances and that no state employee would believe that they were violating Plaintiff's constitutional rights.

The Court has determined as a matter of law that no constitutional violation occurred and that Defendants did not violated a clearly established right. See Section (1), *supra.* Therefore, qualified immunity applies and damages are barred against Defendants in their official capacities.

**(4)** **North Carolina Negligence**

The Court exercised supplemental jurisdiction over Plaintiff's North Carolina negligence claim on initial review. (Doc. No. 39).

Plaintiff conclusively argues that he should be granted summary judgment on all of his claims. Defendants argue that, because they are entitled to summary judgment on the deliberate indifference claims, Plaintiff has also failed to establish that Defendants were negligent.

Plaintiff and Defendants have failed to carry their summary judgment burdens with regards

29

to the North Carolina negligence claims. Therefore, both Motions for Summary Judgment will be denied in this regard and Plaintiff's North Carolina negligence claims will be dismissed without prejudice. Plaintiff is advised that, under Section 1367(d), he has 30 days within which to refile his supplemental claims in state court unless state law provides for a longer tolling period. 28 U.S.C. § 1367(d); Artis, 138 S.Ct. at 594 (holding that federal supplemental jurisdiction statute pauses the clock on a statute of limitations until 30 days after a state-law claim is dismissed by the federal court); see, e.g., Houck v. Lifestore Bank Substitute Tr. Servs., Inc., 582 B.R. 138, 141 (W.D.N.C. 2018).

## IV. PENDING MOTIONS

### (1) Plaintiff's Motion for Hearing

Plaintiff has incorporated in his Motion for Summary Judgment a request for a hearing on his Motion. The record was sufficient to rule on the Motions for Summary Judgment without a hearing. Therefore, Plaintiff's request for hearing will be denied.

### (2) Defendants' Motion to Stay Discovery

Defendants have filed a Motion seeking to stay answers and responses to Plaintiff's requests for interrogatories, production of documents, and admissions pending the Court's resolution of the cross Motions for Summary Judgment. See (Doc. No. 97). As the Court has now ruled on the Motions for Summary Judgment, Defendants' Motion for Stay is denied as moot.

## V. CONCLUSION

Based on the foregoing, Plaintiff's Motion for Summary Judgment and incorporated request for a hearing are denied. Defendants' Motion for Summary Judgment is granted on Plaintiff's deliberate indifference claim but is denied on Plaintiff's North Carolina negligence claim, which is dismissed without prejudice. Defendants' Motion to Stay Discovery is denied as

moot.

**IT IS, THEREFORE, ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, (Doc. No. 74), and the incorporated Motion for Hearing are **DENIED**.

2. Defendants' Motion for Summary Judgment, (Doc. No. 92), is **GRANTED** in part and **DENIED** in part as stated in this Order.

3. Plaintiff's North Carolina negligence claims are **DISMISSED** without prejudice.

4. Defendants' Motion to Stay Discovery, (Doc. No. 100), is **DENIED** as moot.

5. The Clerk of Court is instructed to close this case.

Signed: December 21, 2018

Frank D. Whitney
Chief United States District Judge